UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Sherri Langlois,

      Plaintiff,

      v.                                   Civil Action No. 2:13-cv-262-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

      Defendant.

## OPINION AND ORDER
(Docs. 16, 18)

Plaintiff Sherri Langlois brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are Langlois's motion to reverse the Commissioner's decision (Doc. 16), and the Commissioner's motion to affirm the same (Doc. 18). For the reasons stated below, Langlois's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings and a new decision.

## Background

Langlois was 40 years old on her alleged disability onset date of June 10, 2010. She has a high-school education plus two years at a community college. She has worked as a nurse's assistant, a live-in personal care provider, and a child care provider; and on a part-time basis as a housecleaner and a construction assistant. She has been married and divorced twice, and has three sons.

From the ages of five to fifteen, Langlois was physically abused by her older sister and sexually abused by a male cousin.  (AR 409, 420, 607.)  She has also been a victim of domestic violence by her husbands and fiancé.  In a November 2011 letter, a domestic-violence-victim advocate who worked with Langlois stated that the Burlington Police Department first responded to a domestic violence complaint between Langlois and her fiancé at the time in 2000, and since then the Department responded to 45 complaints between them, the last one in July 2011.  (AR 314.)

Langlois has a long history of anxiety, depression, posttraumatic stress disorder ("PTSD"), attention deficit disorder ("ADD"), and agoraphobia.  (*See, e.g.*, AR 315, 515.)  In 1994, after losing approximately 40 pounds in three months, she was hospitalized for nausea, diarrhea, vomiting, and dehydration.  (AR 1009, 1013, 1020.) Hospital notes describe Langlois as having distorted body image and possibly an eating disorder, and state that Langlois agreed to see a psychiatrist about these issues.  (AR 1009.)  Langlois also has a history of skin problems, including eczema, actinic keratosis, and skin cancer, secondary to a chronic history of artificial tanning[1].  (*See, e.g.*, AR 409, 806.)  In 2011, she had a tumor removed from her chest, and she has had several scrapings of precancerous skin, as well as chemotherapy on her arm, neck, chest, face, and legs.  (AR 50–52, 409.)  She has also had reconstructive surgeries, including abdominal, thigh, and hip liposuction.  (*See, e.g.*, AR 986–90.)

---

[1]  In an August 2009 treatment note, dermatologist Dr. Kathryn Schwarzenberger stated that Langlois had "very severe actinic damage[,] and that for her long-term health, it [wa]s imperative that she stop deliberate tanning."  (AR 393.)

In February 2011, Langlois filed applications for supplemental security income and disability insurance benefits.  In her disability application, she alleged that she has been unable to work since June 10, 2010 due to sleeping issues, depression, skin cancer, anxiety, and panic attacks.  (AR 247.)  At the December 2012 administrative hearing, Langlois testified that, on a typical day, she does not do much: her mother does the laundry and the shopping and helps care for her 12-year-old son; and her son does the dishes, takes out the garbage, vacuums, feeds the dog, and helps with the laundry.  (AR 46.)  She further testified that she does not go to the store or to her son's medical appointments because she gets too stressed in public, and she is unable to finish tasks and maintain focus.  (AR 47–48, 50.)

Langlois's application was denied initially and upon reconsideration, and she timely requested an administrative hearing.  On December 5, 2012, Administrative Law Judge ("ALJ") James D'Alessandro conducted a hearing on the application.  (AR 34–55.) Langlois appeared and testified, and was represented by counsel.  On January 4, 2013, the ALJ issued a decision finding that Langlois was not disabled under the Social Security Act from her alleged onset date through the date of the decision.  (AR 19–27.) Thereafter, the Appeals Council denied Langlois's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 5–7.)  Having exhausted her administrative remedies, Langlois filed the Complaint in this action on September 26, 2013.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that

4

there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, ALJ D'Alessandro first determined that

Langlois had not engaged in substantial gainful activity since her alleged disability onset

date of June 10, 2010.  (AR 22.)  At step two, the ALJ found that Langlois had the severe

impairments of depression and anxiety, but her borderline personality disorder was not

severe.  (*Id.*)  At step three, the ALJ determined that none of Langlois's impairments,

alone or in combination, met or medically equaled a listed impairment.  (AR 23–24.)

Next, the ALJ determined that Langlois had the RFC to perform "light work," as defined

in 20 C.F.R. § 404.1567(b), except as follows:

> [Langlois] needs low contact with people, cannot work at unprotected
> heights or tolerate temperature extremes, cannot tolerate more than
> moderate levels of noise[,] and can only occasionally tolerate moving
> mechanical part[s], operating a motor vehicle, tolerate humidity and
> wetness, tolerate vibration[,] and tolerate dust, odors, fumes[,] and
> pulmonary irritants.

(AR 24.)  Given this RFC, the ALJ found that Langlois was capable of performing her

past relevant work as a housecleaner and a personal care provider.  (AR 27.)

Additionally, the ALJ found that Langlois could perform other work, including the jobs

of a "buckler and lacer (boot and shoe)," an "addresser I (clerical)," and a "preparer

(jewelry-silver)."  (*Id.*)  The ALJ concluded that Langlois had not been under a disability

from the alleged onset date of June 10, 2010 through the date of the decision.  (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

### I.    The ALJ erred in affording little weight to Dr. Beatty's opinions.

Langlois argues that the ALJ erred in his evaluation of the opinions of treating physician Dr. Dennis Beatty.  Langlois began treating with Dr. Beatty in June 2004 (AR 607), seeing him frequently during the alleged disability period (*see, e.g.*, AR 461–62, 515, 517, 519, 826).  In a September 2011 treatment note, Dr. Beatty stated that Langlois's moods were not well controlled, and he supported "an at least temporary disability for her based on this."  (AR 518.)  In November 2011, Dr. Beatty stated in a letter "To Whom It May Concern" that, in his medical opinion, Langlois is "unable to participate in any work-related activity at this time," due to her "severe anxiety and depression, related to [PTSD]."  (AR 608.)  Dr. Beatty explained that Langlois's moods are "very unstable and debilitating, such that she has a very hard time focusing and completing even simple tasks such as cooking and housework."  (*Id.*)  Dr. Beatty further explained that Langlois has a component of agoraphobia such that she "rarely leaves her house, only for doctor's appointments and when taken by a friend," and also has "issues with anger and rage," as well as sleeping problems due to anxiety.  (*Id.*)  Dr. Beatty concluded that Beatty is "in no condition to pursue any work[-]related activity" until she is "stabilized and functional."  (*Id.*)

In October 2012, Dr. Beatty submitted Medical Source Statements ("MSS") of Langlois's ability to do mental and physical activities.  (AR 840–48.)  In the mental MSS, he opined, among other things, that Langlois is markedly restricted in understanding and remembering simple instructions, carrying out simple instructions, and making judgments on simple decisions; and extremely restricted in understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex decisions.  (AR 840.)  Dr. Beatty explained: "[Langlois has] ongoing severe anxiety, PTSD, [and obsessive compulsive disorder] tendencies.  Th[ese] cause[] inability to focus, even on simple tasks, and to remember things."  (*Id.*)  Dr. Beatty stated that Langlois is moderately limited in her ability to interact appropriately with the public and others, and to respond appropriately to changes in a work setting.  (AR 841.)  He explained that Langlois has frequent mood swings and angers easily.  (*Id.*)  Given these limitations, Dr. Beatty opined that Langlois would be absent from work for more than four days per month due to her mental impairments.  (AR 842.)

In March 2013, Dr. Beatty wrote another letter in support of Langlois's disability application, this time stating that Langlois has a long history of anxiety, depression, PTSD, ADD, and agoraphobia; and that, in his medical opinion, Langlois's medical and emotional issues "preclude her ability to participate in any gainful employment."  (AR 958.)  Noting that Langlois recently had surgery on her hand but suffered ongoing pain thereafter, Dr. Beatty stated that Langlois "continues to suffer from a combination of emotional and medical issues, which require ongoing therapy [and] medication

management, and which significantly impact her ability to function in the home setting and also limit[] her ability to participate in outside endeavors. (*Id.*)

A treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Where, as here, an ALJ gives a treating physician's opinions something less than controlling weight, he must provide "good reasons" for doing so. *Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998). The Second Circuit has consistently held that the failure to provide "good reasons" for not crediting the opinions of a claimant's treating physician is a ground for remand. *Sanders v. Comm'r Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). Even when a treating physician's opinion is not given controlling weight, the regulations require the ALJ to consider several factors—including the length of the treatment relationship, the frequency of examination, and whether the physician is a specialist in the area covering the particular medical issues—in determining how much weight it should receive. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).

The ALJ here found as follows regarding Dr. Beatty's opinions on Langlois's mental limitations: "I do not find Dr. Beatty's opinion[s] entitled to much weight." (AR 25.) The ALJ gave three reasons for affording little weight to Dr. Beatty's opinions: (1) Dr. Beatty "is not a psychologist or psychologist [sic]"; (2) the objective medical evidence "does not reflect many psychological signs from [Langlois's] mental disorder"; and (3) portions of Dr. Beatty's opinions constitute "a conclusion on an ultimate issue in

the case and cannot be given controlling weight."  (AR 25.)  The Court finds that these are not "good reasons" for affording little weight to Dr. Beatty's opinions, and substantial evidence does not support the ALJ's analysis.

The ALJ's third reason for giving limited weight to Dr. Beatty's opinions—that they cannot be given controlling weight because they are "on an ultimate issue in the case"—is based on a correct statement of the law: medical source opinions on issues reserved to the Commissioner, such as the conclusion that the claimant is disabled, are not determinative or entitled to special weight based on the source of the medical opinion.  *See Snell v. Apfel*, 177 F.3d 128, 133–34 (2d Cir. 1999) ("The final question of disability is . . . expressly reserved to the Commissioner.").  But it does not follow that the Commissioner is free to disregard a treating physician's opinions on these issues.  *Id.* at 134; *see Duncan v. Astrue*, No. 07–cv–1578–OWW–TAG, 2009 WL 409533, at *17 (E.D. Cal. Feb. 17, 2009) (citing 20 C.F.R. § 416.927(e)).  The Second Circuit explained: "Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt [ALJs] from their obligation . . . to explain why a treating physician's opinions are not being credited."  *Snell*, 177 F.3d at 134 (citations omitted); *see* SSR 96-5p, 1996 WL 374183, at *3 (1996) ("The [ALJ] is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.").  This is especially true when, as here, the treating physician's opinions are consistent with and supported by the record, as discussed below.  Moreover, Dr. Beatty's statements that

Langlois is disabled and unable to work constitute only a portion of his opinions regarding Langlois's functional limitations caused by her mental impairments.  It was improper for the ALJ to give little weight to *all* of Dr. Beatty's opinions based merely on their inclusion of statements on issues reserved to the Commissioner.

The ALJ's second reason for discrediting Dr. Beatty's opinions—that the objective medical evidence, including Dr. Beatty's own treatment notes, "does not reflect many psychological signs from [Langlois's] mental disorder" (AR 25)—is not supported by substantial evidence.  In fact, the medical record, including Dr. Beatty's treatment notes and the opinions of multiple other medical sources, supports Dr. Beatty's opinions regarding Langlois's mental limitations.  For example, in a July 2011 treatment note, Dr. Beatty observed that Langlois was "tearful, crying easily, [and] show[ing] some psychomotor agitation."  (AR 515.)  Dr. Beatty stated that Langlois was "certainly not functioning well right now, with ongoing anxiety, depression, [and] agoraphobia."  (*Id.*)  In an August 2011 treatment note, Dr. Beatty recorded that Langlois was having a hard time finishing tasks, was anxious about leaving the house and had not gone out much, and was having anger issues, hitting or breaking things to release her anger.  (AR 519.)  In a November 2011 treatment note, Dr. Beatty observed that Langlois had some "pressured speech" and cried a few times during the office visit.  (AR 517.)  He stated that Langlois was still "not functioning well," having a difficult time completing tasks and having the courage to do things.  (*Id.*)  Although Langlois was seeing a counselor, she and Dr. Beatty discussed "options for further therapy."  (*Id.*)  In a September 2012 treatment note, Dr. Beatty stated that Langlois was still having "a lot of issues with focus,

concentration[,] and memory," and "ongoing issues with obsessing on things[;] frequent mood swings with crying easily[;] and sometimes she will get an overwhelming sense of panic, which can cause her to feel flushed [and] numbness in the face, hands[,] and feet[;] and sometimes feeling like she might pass out."  (AR 827.)  The record reflects that Dr. Beatty and other providers prescribed several different medications to address Langlois's mental problems, including Dexedrine to treat her ADD, Lamictal to stabilize her moods, and Seroquel and citalopram to treat her anxiety and depression.  (*See, e.g.*, AR 461–62, 517–20, 616–17.)

Dr. Beatty's opinions are also consistent with the opinions and treatment notes of other medical sources which indicate that Langlois is severely limited by her mental impairments.  For example, in July 2011, treating therapist Robert Munger, MA, assessed Langlois with PTSD, major depressive disorder (recurrent, severe), and possible borderline personality disorder; and assigned a GAF score of 45 to Langlois (AR 630), placing her in the category of "41-50," which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)," Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 32 (4th ed. 2000)).  In a July 2011 treatment note, Munger observed that, although Langlois's grooming was adequate, she was "[t]earful and panicky."  (AR 617.)  Another of Munger's July 2011 treatment notes states that Langlois was again tearful and that she was experiencing "very high levels of distress."  (AR 618.)  Munger's other treatment notes reflect that, despite good grooming and hygiene, Langlois was tearful

during most therapy sessions. (*See, e.g.*, AR 610–15.) For example, November 2011 session notes indicate that Langlois's grooming and hygiene was "excellent," but she was "tearful, angry, [and engaging in] rapid loud speech." (AR 612.) In a May 2012 mental MSS, stating that Langlois's ability to function "fluctuates depending on severity of stress," Munger opined that Langlois is markedly restricted in her ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, and respond appropriately to changes in a work setting. (AR 809.) Like Dr. Beatty, Munger opined that Langlois would miss more than four days of work per month due to her mental impairments. (AR 811; *see* AR 842.)

The opinions of psychologist Milton Marasch, Ph.D., are also consistent with Dr. Beatty's opinions about Langlois's mental impairments. In February 2011, Dr. Marasch stated in a psychological evaluation that Langlois should "hold[] off on job-seeking until or unless the present degree of distress is better managed. Her ability to focus in a work setting is likely impaired at present." (AR 411.) Dr. Marasch diagnosed Langlois with PTSD, major depressive disorder (recurrent, severe), and borderline personality disorder; and assigned a GAF score of 41 to Langlois, placing her in the same GAF category that Munger placed her in, indicating "[s]erious symptoms" or "any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV*, at 32. Dr. Marasch provided the following detail in his evaluation:

> [Langlois's] PTSD is evidenced by multiple and varied traumatic events throughout her life, nightmares, unwelcome recollections, avoidance behaviors, decreased interest in enjoyable activities, detachment, anger, concentration difficulties, and a startle reflex. Depression is indicated by

depressed mood, most of the day, every day, poor concentration, severe hyposomnia . . . , low self-esteem, [and] teariness. . . .

The trauma appears to have started early enough in life to have had profound impacts on interpersonal patterns and personality development as [Langlois] finds herself in repeated troubled, abusive relationships. Borderline personality disorder is indicated by abandonment fears, history of sensation seeking, and abrupt episodes of mood dysregulation, as well as other symptoms.

(*Id.*)  In August 2011, Dr. Marasch completed a brief report regarding Langlois's mental status, and concluded that her ability to work is "likely impaired [at] present symptom levels."  (AR 405.)

Instead of giving great weight to the opinions of Langlois's treating and examining providers, including Dr. Beatty, Dr. Marasch, and therapist Munger; the ALJ adopted the opinions of an unnamed "nonexamining agency program psychologist," on the grounds that those opinions are consistent with the record, including Langlois's report of her activities of daily living.  (AR 23 (citing AR 86–100).)  In support of this finding, the ALJ stated that Langlois "was able . . . to take care of three children, drive, clean, cook, do laundry[,] and sustain concentration, persistence[,] and pace . . . ."  (AR 23.)  The record does not support this assessment.  Langlois's children are mentioned very rarely in the record, and in fact, only one of them appears to have been a minor during the relevant period.  (*See* AR 410, 420, 426, 607.)  Moreover, as noted above, Langlois testified that her mother takes care of her minor son regularly, taking him to dentist appointments and shopping for his clothes; her son does the dishes, takes out the garbage, vacuums, and feeds the dog; her mother or boyfriend does the grocery shopping; and her mother or son does the laundry.  (AR 45–47.)  Although Langlois's Function Reports indicate that she is

able to do some of these activities on occasion, taken as a whole, the Reports reflect that Langlois does very little on a daily basis and spends a good portion of many days at home crying.  (AR 235–42, 284–94.)

Finally, the ALJ's finding that Dr. Beatty's opinions have little value because Dr. Beatty "is not a psychologist or psychologist [sic] and as such has little expertise to accurately assess functional limitations from mental impairments" (AR 25), is not a "good reason" for affording little weight to those opinions.  In assessing the weight of a treating physician's opinions, the ALJ must consider whether the physician specializes in the area under treatment.  *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  However, the physician's specialty is but one factor among many which should be considered.  *See* 20 C.F.R. § 404.1527(c).  While the ALJ discredits Dr. Beatty's opinions partly because he is not a psychologist, the ALJ improperly fails to credit those opinions because Dr. Beatty had a longstanding and frequent treating relationship with Langlois.  (*See, e.g.*, AR 340, 342, 362, 394, 461–62, 515, 517, 519, 826.)  The applicable regulation states:

> Generally, the longer a treating source has treated [the claimant] and the more times [the claimant] ha[s] been seen by a treating source, the more weight [the ALJ] will give to the source's medical opinion.  When the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment, [the ALJ] will give the source's opinion more weight than [the ALJ] would give it if it were from a nontreating source.

20 C.F.R. § 404.1527(c)(2)(i).

15

On balance, an analysis of Dr. Beatty's opinions using the regulatory factors, particularly Dr. Beatty and Langlois's treatment relationship and the fact that Dr. Beatty's opinions are consistent with the record as a whole including his own treatment notes, favors affording significant weight to Dr. Beatty's opinions. Thus, the matter must be remanded for a new analysis of these opinions and all other portions of the decision affected by the ALJ's decision to afford little weight thereto.

## II.      The ALJ failed to follow the "special technique" at the second and third steps.

Langlois also asserts that the ALJ failed to analyze her mental impairments under the "special technique" laid out in 20 C.F.R. § 404.1520a(c)(4). For the following reasons, the Court agrees and finds that, on remand, the ALJ should redo this analysis as well.

In addition to following the five-step sequential analysis outlined above, the regulations provide that, when evaluating the severity of a claimant's mental impairment(s), the ALJ must apply a "special technique" to "rate the degree of functional limitation resulting from the impairment(s)." 20 C.F.R. § 404.1520a(a), (b)(2). The regulations set forth "four broad functional areas" in which the ALJ must rate the degree of the claimant's functional limitation: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation," 20 C.F.R. § 404.1520a(c)(3), using a five-point scale of "[n]one, mild, moderate, marked, and extreme," to rate the first three functional areas, and a four-point scale of "[n]one, one or two, three, [and] four or more" to rate the fourth functional area, 20 C.F.R. § 404.1520a(c)(4). The regulations explicitly require the ALJ to "document application of

the technique in the decision," 20 C.F.R. § 404.1520a(e), including "a specific finding as
to the degree of limitation in each of the functional areas," 20 C.F.R. § 404.1520a(e)(4).

In *Kohler v. Astrue*, the Second Circuit explained:

> While the regulations no longer require the ALJ to complete [the standard
> Psychiatric Review Technique Form], they do require the ALJ's
> written decision to reflect application of the technique, and explicitly provide that
> the decision "must include a specific finding as to the degree of limitation
> in each of the functional areas described in paragraph (c) of this section."

546 F.3d 260, 266 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1520a(e)(2)).

In some cases, an ALJ's failure to make the specific findings required by the
special technique may amount to harmless error.  For example, in *Carrigan v. Astrue*,
Civil Action No. 2:10–cv–303, 2011 WL 4372651, at *7-8 (D. Vt. Aug. 26, 2011), this
Court found that the ALJ's failure to conduct the function-by-function assessment of the
claimant's mental capabilities was harmless error, because: (a) the ALJ's decision
discussed the claimant's work-related functions and limitations; and (b) substantial
evidence supported the ALJ's RFC determination.  And in *Moore v. Astrue*, No. 11–CV–
952 (TJM/CFH), 2013 WL 935855, at *7-8 (N.D.N.Y. Feb. 5, 2013), another court found
that the ALJ's "failure to comply with the mechanics of the special technique" was
harmless error because the ALJ did in fact evaluate plaintiff's mental impairments
"within the informal confines of the special technique" and correctly found that the
claimant "failed to present any medical evidence demonstrating mental impairments[,] . .
. [and thus] failed to establish a colorable impairment requiring application of the special
technique."

17

In this case, however, the ALJ's error was not harmless.  The facts here are more like those in *Kohler*, where the Second Circuit explained as follows:

> In this case, the ALJ does not appear to have evaluated each of the four functional areas, and *did not record specific findings as to Kohler's degree of limitation in any of the areas*.  Nor did [the ALJ] conduct a distinct analysis that would permit adequate review on appeal even without the requisite findings. . . .
>
> . . . .
>
> Effective review by this Court is frustrated by the decision's failure to adhere to the regulations.  First, because *the decision contains no specific findings regarding Kohler's degree of limitation in the four functional areas by which disabling conditions are rated*, the Court cannot determine whether there is substantial evidence for the ALJ's conclusion that Kohler's impairment, while severe, was not as severe as any listed disabling condition. . . .

*Id.* at 267–68 (emphases added).  Here, the ALJ also did not make any of the required findings in the four designated areas.  Despite stating that Langlois's depression *did not* result in "marked" functional limitations in the first three areas and that Langlois *did not* show "repeated" episodes of decompensation (AR 23), the ALJ failed to state whether the degree of Langlois's functional limitations was none, mild, or moderate, as required by 20 C.F.R. § 404.1520(c)(4).  Although the ALJ cited the findings of a nonexamining agency psychologist who rated Langlois's mental impairments in the designated areas (AR 23 (citing AR 86–115); *see* AR 93), this was insufficient.  *See Benjamin v. Astrue*, No. 11–CV–2074 (NGG), 2013 WL 271505, at *5 (E.D.N.Y. Jan. 23, 2013) ("ALJ's failure to provide any analysis or specific findings as to each of the four functional areas . . . was legal error.") (internal quotation marks omitted); *Day v. Astrue*, Civil Action No. 09–131 (DRH), 2011 WL 1467652, at *12 (E.D.N.Y. Apr. 18, 2011) (faulting ALJ's

application of the special technique because, "while listing the activities the ALJ found Plaintiff capable of completing, the ALJ did not provide any analysis or specific findings as to each of the four functional areas").

Most importantly, the ALJ's failure to apply the special technique at steps two and three was not harmless in this case because, unlike in *Carrigan* and *Moore*, there is ample evidence demonstrating that Langlois suffered from significant mental impairments in each of the functional areas, as discussed above.  In light of this evidence, the ALJ's failure to apply the special technique requires remand.  *See Kohler*, 546 F.3d at 269 (where court could not identify findings regarding plaintiff's limitations in the functional areas, nor discern whether ALJ considered all the evidence relevant to those areas, court could not say the decision reflected an application of the correct legal standard, and ordered remand for ALJ to properly apply the special technique); *Fait v. Astrue*, No. 10–CV–5407 (NGG), 2012 WL 2449939, at *7 (E.D.N.Y. June 27, 2012) ("ALJ's attempt to determine ratings for degrees of functional limitations simply by citing the lack of evidence on the record was an error of law, and his failure to ventilate relevant evidence on the record was improper"); *Duell v. Astrue*, No. 8:08–CV–969, 2010 WL 87298, at *7 (N.D.N.Y. Jan. 5, 2010).

## III.   Remaining Issues

Given the above findings that the ALJ failed to give sufficient weight to the opinions of treating physician Dr. Beatty, and failed to follow the "special technique" at the second and third steps of the evaluation, the matter must be remanded for further proceedings and a new decision starting at step two.  Therefore, the Court need not

consider Langlois's remaining arguments regarding the ALJ's RFC determination, step-four finding that Langlois was able to perform her past relevant work, and alternative step-five finding that Langlois could perform other work.  The Court notes, however, that the ALJ's step-four and -five findings are inadequate for several reasons.

First, to reach a finding of not disabled at step four of the ALJ's sequential evaluation, the ALJ must find that the claimant's "past relevant work" was "work that [the claimant] ha[s] done within the past 15 years, that was *substantial gainful activity*, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 404.1560(b)(1) (emphasis added).  A key component of this definition is that the work must amount to "substantial gainful activity" ("SGA"), which is generally presumed if the claimant has worked for "substantial earnings" during the relevant period.  *See* 20 C.F.R. § 404.1574(a)(1) ("Generally, if you worked for substantial earnings, we will find that you are able to do substantial gainful activity.").  Here, the ALJ did not analyze whether Langlois's work as a housecleaner amounted to SGA; and in fact, the record demonstrates that this work likely did not rise to that level, as it was done for only close friends and relatives, on an extremely part-time basis, and for little pay.  (*See* AR 42 (work was done only for mom and close friends), 248 (work was done only two days weekly for three hours each day at $25 per day), 260 (work was done only one day weekly for two hours each day at $100 per day); *see also* Doc. 16-1, Ex. A, SGA definition and chart.)  *See Inman v. Astrue*, Civil No. 09–29–P–H, 2009 WL 3711486, at *3 (D. Me. Nov. 3, 2009) (remand required where hotel housekeeper job, as performed

by plaintiff, was not SGA "and thus [was] not available to the [ALJ] for consideration as past relevant work at Step 4").

Second, the ALJ determined that Langlois could perform her past relevant work without comparing the demands of those jobs to Langlois's RFC, and without the benefit of vocational testimony.  Regarding housecleaning work, it is unclear whether this job was limited to "light" work, which was the most the ALJ determined Langlois could do.  Moreover, it appears that Langlois's nonexertional limitations, as determined by the ALJ—including particularly the limitation of only occasional exposure to "dust, odors, fumes[,] and pulmonary irritants" (AR 24)—may preclude her from being able to do housecleaning work on anything more than a very part-time basis.  Regarding personal care provider work, it seems that Langlois's limitation of having only "low contact with people"—again, as determined by the ALJ (*id.*)—may preclude her from being able to do this job.  The ALJ should have obtained vocational testimony about these issues at the administrative hearing, and should have made specific findings based on that testimony in his decision.  *See* SSR 82-62, 1982 WL 31386, at *4 (1982) ("In finding that an individual has the capacity to perform a past relevant job, the determination . . . must contain among the findings the following specific findings of fact: . . . [a] finding of fact as to the physical and mental demands of the past job/occupation[; and] . . . [a] finding of fact that the individual's RFC would permit a return to his or her past job or occupation.").

The Commissioner argues that, even assuming the ALJ erred at step four, the error is harmless because the ALJ made an alternative step-five finding, to which Langlois

does not object.  (*See* Doc. 18 at 13.)  In her reply brief, Langlois does in fact object to the ALJ's step-five finding (*see* Doc. 19 at 8-10), and the Commissioner has not sought to file a response.  Langlois argues that the ALJ's finding that Langlois "could perform other work as a buckler and lacer (boot and shoe), an addresser I (clerical)[,] and a preparer (jewelry-silver)" (AR 27), is flawed both procedurally and substantively.  The Court agrees.  The ALJ's step-five analysis consists of one sentence and citation to two Exhibits which are in fact one in the same.  (*See* AR 27 (citing AR 86–100, 101–15).)  The Exhibit is an agency consultant report from August 2011.  (AR 86–100, 101–15.)  It is unclear who prepared the report, and what vocational expertise that individual had, if any.  (*See* AR 100.)  Moreover, the report does not contain many of the nonexertional limitations contained in the ALJ's RFC determination (*see* AR 24), and, unlike the RFC determination, attributes no functional limitations to physical conditions (AR 92).

Furthermore, it is the Commissioner's burden at step five to "show that there is work in the national economy that the claimant can do," *Poupore*, 566 F.3d at 306, and the regulations require that, in making this showing, the ALJ must consider whether there is work "exist[ing] in significant numbers either in the region where [the claimant] lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).  Here, the ALJ did not provide any numbers at all for the jobs listed in his decision, let alone "significant" numbers of jobs.  On remand, if the ALJ proceeds past step four of the sequential evaluation, he should employ the services of a vocational expert to assist in assessing whether Langlois could perform jobs existing in significant numbers in the national economy.  Although "the mere existence of a nonexertional impairment does not

automatically require the production of a vocational expert," *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986), it is widely held that, "where the claimant's nonexertional impairments . . . significantly diminish his capacity to perform the full range of activities listed in the [Guidelines], the [Commissioner] must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with claimant's characteristics," *Manns v. Shalala*, 888 F. Supp. 470, 484 (W.D.N.Y. 1995).

Finally, on remand, the ALJ should address the issue of Langlois's date last insured. In his decision, the ALJ stated that Langlois "has acquired sufficient quarters of coverage to remain insured through December 31, 2014." (AR 20.) Langlois argues that her earnings record indicates that she remained insured for two additional years: through December 31, 2016. (*See* Doc. 16-1 at 2, 6 (citing AR 5, 227).) As the Commissioner points out, however, Langlois's counsel stated in a November 2012 letter to the Office of Disability Adjudication and Review that the date last insured is June 31, 2014. (Doc. 18 at 6 (citing AR 178).) Either way, it appears the ALJ's error had no effect, as the decision reflects that the ALJ considered whether Langlois was disabled "through the date of th[e] decision," January 4, 2013. (AR 27.) Nonetheless, the Court does not decide the issue, leaving it for the ALJ to determine on remand.

## Conclusion

For these reasons, the Court GRANTS Langlois's motion (Doc. 16), DENIES the Commissioner's motion (Doc. 18), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 16th day of December, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge